# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|                          |     |                         |
|--------------------------|-----|-------------------------|
| **ROBERT REBAUDO,**      | :   |                         |
| Plaintiff,               | :   |                         |
|                          | :   |                         |
| v.                       | :   | No. 3:09-CV-00437 (DJS) |
|                          | :   |                         |
| **AT&T SERVICES, INC.,** | :   |                         |
| Defendant.               | :   |                         |

## MEMORANDUM OF DECISION AND ORDER

The plaintiff, Robert Rebaudo ("Rebaudo"), brings this action against the defendant, AT&T Services, Inc. ("AT&T"), alleging retaliation for having filed a complaint of unlawful employment discrimination, in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Con. Gen. Stat. §§46a-60, et seq. Jurisdiction exists on the basis of diversity of citizenship under 28 U.S.C. §1332. The defendant now moves for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, the defendant's motion for summary judgment (doc. # 65) is **GRANTED**.

## BACKGROUND

### I.    FACTS

Before setting forth the background facts of this case, the Court notes that the defendant, in its reply memorandum, maintains that the plaintiff has, in various respects, failed to comply with Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut (L. Civ. R. 56). Specifically, the defendant notes certain deficiencies in the plaintiff's "Local Rule 56 (a)(2) Statement," which was filed with the plaintiff's opposition memorandum.

Pursuant to L. Civ. R. 56 (a)(2), "[t]he papers opposing a motion for summary judgment shall include a document entitled 'Local Rule 56 (a)(2) Statement,' which states in separately

numbered paragraphs . . . corresponding to the paragraphs contained in the moving party's Local Rule 56 (a)(1) Statement whether each of the facts asserted by the moving party is admitted or denied." "All material facts set forth in [the moving party's Local Rule 56 (a)(1)] [S]tatement and supported by the evidence will be admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56 (a)(2)." L. Civ. R. 56 (a)(1).

"[E]ach denial in an opponent's Local Rule 56 (a)(2) Statement [] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial . . . . The 'specific citation' obligation of this Local Rule requires counsel . . . to cite to specific paragraphs when citing affidavits or responses to discovery requests, and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length. Counsel . . . are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56 (a)(1) . . . ." L. Civ. R. 56 (a)(3).

The Court agrees with the defendant that the plaintiff's Local Rule 56 (a)(2) Statement fails to comply with the requirements of that rule in certain respects. In some of the plaintiff's responses, he ignored the facts asserted by the defendant and attempted to address different issues (e.g., Doc. # 74, ¶ 1, responding to Doc. # 67, ¶ 1); in some he denied the asserted facts but cited to evidence that does not support his denial (e.g., Doc. # 74, ¶ 39, responding to Doc. # 67, ¶ 39); and in others he denied the asserted facts but either made no attempt to cite to any evidence at all (e.g., Doc. # 74, ¶ 23, responding to Doc. # 67, ¶ 23) or cited to unsworn third-

-2-

party letters (e.g., Doc. # 74, ¶ 8, responding to Doc. # 67, ¶ 8). These examples are not intended to be an all-inclusive list of the problems in the plaintiff's Local Rule 56 (a)(2) Statement, but they illustrate the deficiencies that pervade that Statement.

"Federal Rule of Civil Procedure 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute. A district court is obligated only to consider the materials cited to it by the parties." *Morales v. New York State Department of Labor*, 12-3331-cv, 2013 U.S. App. LEXIS 14306, at *3 (2d Cir. July 16, 2013) (internal quotation marks and citation omitted). As previously noted, "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56 (a)(1) . . . ." L. Civ. R. 56 (a)(3). To the extent that the plaintiff's Local Rule 56 (a)(2) Statement fails to comply with the requirements of the Local Rules, the facts that are set forth in the defendant's Local Rule 56 (1)(1) Statement and are properly supported by citations to evidence in the record will be deemed admitted.

The plaintiff is an individual residing in West Haven, Connecticut. The defendant is a Delaware corporation with its principal place of business in Dallas, Texas. In February 1980, the plaintiff began working for the defendant as a building equipment maintainer and eventually was promoted to the position of building mechanic. As a building mechanic, the plaintiff maintained and repaired air-conditioning, refrigeration, and heating units at AT&T properties. The plaintiff held this position until his termination on February 28, 2006.

Bobby Sayre became the AT&T Area Manager in the company's Corporate Real Estate Department in September 2004, with the responsibility of supervising the four AT&T property

managers and the approximately twenty-six building mechanics, including the plaintiff, who reported to those property managers. The plaintiff was a member of Sayre's organization from September 2004 until his termination. From September 2004 until his termination, the plaintiff was responsible for maintenance at the AT&T offices in Branford, North Branford, Clinton, Deep River, Essex, Guilford, Madison, North Madison, Old Saybrook and Westbrook, as well as the East Haven office from September 2004 through approximately June 2005.

The plaintiff had a history of disciplinary action being taken against him during his employment with the defendant. This history included an instance of wage reduction for a reported infraction of company rules and insubordination[1], and an instance of a suspension for reported insubordination,[2] both of which occurred in 1999. Sayre counseled the plaintiff on various performance issues during the time the plaintiff reported to him. For example, in 2005 Sayre counseled the plaintiff regarding his failure to respond to pages concerning customer requests or complaints. The plaintiff made no indication that he would try to improve upon his performance in the area of responding to pages, but instead offered Sayre excuses for his failure to follow company policy. Sayre did not have problems with the other building mechanics reporting to him in regard to responding to pages.

_____

[1]The Notice of Reportable Action pertinent to this matter contains the following remarks: "Making unauthorized purchase of tools and safety equipment. Failure to maintain equipment necessary to perform his job function in a safe manner." (Doc. #66-1, at 20).

[2]The Notice of Reportable Action pertinent to this matter contains the following remarks: "Refusal to do work assignment, specifically to make the boiler at the Branford Co. operational and . . . upon being suspended, refused a direct order to submit keys and ID to supervisor. Suspended without pay for one (1) day." (Doc. #66-1, at 21).

Building mechanics must follow a purchasing procedure when ordering parts for a job. This purchasing procedure required building mechanics to obtain authorization from their supervisors prior to making any purchases.  Building mechanics were required to receive authorization via email, or in emergent situations via telephone discussions. All the building mechanics in Sayre's organization, including the plaintiff, had laptop computers that allowed them to email their supervisors to request permission to purchase parts and supplies they needed for their duties. The plaintiff understood that obtaining advance authorization for purchases was required, but he did not always obtain authorization before making purchases. According to the plaintiff, he did not always have time to follow the advance authorization procedure, because his duties involved a good deal of traveling. All of the other building mechanics under Sayre followed the purchasing procedure without any problems.

In April of 2005, Anthony Sammataro became the Property Manager for New Haven and the surrounding areas. Sammataro supervised the plaintiff as well as five other building mechanics in Connecticut. During the time that Sammataro supervised the plaintiff, the plaintiff had the lowest maintenance compliance numbers of the group, failed to follow purchase procedures, and was insubordinate on several occasions.

 In approximately June of 2005, one of Sammataro's management peers, Patricia Suggs, reported to Sammataro that one of her female employees complained that the plaintiff was bothering her in an area within the East Haven office known as the "frame." (Doc. #66, at 11). The plaintiff would not ordinarily have any work-related reason to be in the frame.  Sammataro thereafter  directed the plaintiff to stay out of the frame, but the plaintiff did not follow his instruction.  Suggs subsequently asked Sammataro to permanently transfer the plaintiff out of the

East Haven office. The same female employee who worked in the frame area subsequently filed a complaint with AT&T's Equal Employment Opportunity ("EEO") group, complaining that the plaintiff was sexually harassing her. The defendant officially moved the plaintiff's reporting location after the EEO complaint was filed.

In response to the sexual harassment complaint against the plaintiff, the defendant began an investigation into the allegations through Tricia O'Neal, the EEO investigator.  As part of the investigation, O'Neal asked that the plaintiff speak with her. The plaintiff requested the presence of an "impartial witness" or attorney for the meeting, or that he be able record it. The defendant would have allowed the plaintiff to have a union representative present, but it was against company policy to allow attorneys to participate in internal investigations and to record investigation discussions. O'Neal explained the company policy to the plaintiff, and he refused to speak with her or participate in the investigation without his attorney present or the ability to record the discussion.  Since the plaintiff did not speak with O'Neal during the investigation, her conclusions did not include a statement by the plaintiff.

During the investigation, O'Neal interviewed several witnesses, including the female employee who had filed the complaint. (Doc. #66, at 9). Based on O'Neal's investigation, the defendant concluded that the plaintiff had violated the company's sexual harassment policy and engaged in behavior that violated its Code of Business Conduct and EEO policy. On August 11, 2005, the defendant placed the plaintiff on Final Warning status:

> Mr. Rebaudo is placed on a *Final Warning* for one year for serious violations
> of the SBC Sexual Harassment Policy and SBC Code of Business Conduct.
> These violations were the basis of an internal EEO complaint and

investigation of Mr. Rebaudo for derogatory sexual remarks and additional
threatening, intimidating behavior. These infractions include but are not
limited to verbal sexual harassment by making repeated deliberate graphic
sexual comments about female coworkers, making unfounded remarks about
female employees of a sexual nature to coworkers, creating an intimidating
and offensive working environment, making verbal threats in the workplace
and failure to follow directives given by management or to comply with
Company policies. Mr. Rebaudo refused to follow the management directive
not to discuss the pending investigation and refused to participate in an
investigatory interview. Mr. Rebaudo will be assigned to report to work in a
directly supervised environment. Any further violations of the SBC Sexual
Harassment Policy or the SBC Code of Business Conduct, including but not
limited to sexual harassment, intimidation, threats, or insubordination, will
result in immediate termination.

(Doc. #66-1, at 28).

On August 15, 2005, the plaintiff filed a complaint with the Connecticut Commission on
Human Rights and Opportunities ("CHRO"), alleging that the defendant discriminated against
him based on his sex in connection with its investigation of the sexual harassment complaint that
had been filed against him. After the plaintiff was placed on Final Warning status, it came to
Sammataro's attention that the plaintiff had failed to perform certain required and assigned
preventative maintenance routines. Sammataro reinforced the importance of preventative
maintenance with his staff several times, including monthly safety meetings, via email, and in the
mornings prior to the mechanics' departures for various work assignments. For 2005, the average
preventative maintenance completion rate for the other building mechanics was 86%. The
plaintiff's 2005 average for preventative maintenance completion was less than 46%. Sammataro
counseled the plaintiff individually a number of times about the need to improve his preventative
maintenance completion rate. The plaintiff's low completion rate for preventative maintenance
continued to be a problem into 2006. The plaintiff completed only 44% of his preventative

maintenance for January 2006. According to the plaintiff, he gave emergency repair jobs priority over preventative maintenance jobs. He further contends that he had more emergency repair jobs than other building mechanics.

On September 24, 2005, the plaintiff was assigned to perform preventative maintenance on the Old Saybrook boiler. The plaintiff did not complete this preventative maintenance. As of October 25, 2005, he had "performed work on the oil and water side, but [had] not complete[d] the cleaning job because [he] lacked the proper brushes for the job." (Doc. # 74, at 88-89, ¶ 11). The plaintiff signed off on a report indicating that he had completed the annual cleaning, inspection and safety testing of the Old Saybrook boiler. According to the plaintiff, he had notified Sammataro that he had not completed the preventative maintenance work on the Old Saybrook boiler and was told by Sammataro to "close out the ticket." (*Id.*)  The plaintiff describes the Old Saybrook boiler as a "problem boiler," which was sixty-four years old and was replaced in 2006, sometime after he was terminated. (*Id.*).

 Maintaining boilers was a key part of the plaintiff's job responsibilities as a building mechanic. If there were any problems with the boiler, it could become damaged and cause a fire. Preventative maintenance routines, including annual cleaning, inspection and safety testing on boilers were critical to ensure safety. Each year, the defendant scheduled the Old Saybrook boiler for preventative maintenance prior to the beginning of the heating season.

On November 3, 2005, and again on November 7, 2005, when confronted by Sammataro, the plaintiff admitted that he had not cleaned the Old Saybrook boiler and that he would not clean it, because the company's Safety Manager, Bruce Austin ("Austin"), advised him that he needed a

different respirator to complete the job.[3] Although Austin had determined that no respirator was required to safely perform the boiler cleaning, once the plaintiff raised the issue he was supplied with two respirators that Austin deemed appropriate. The plaintiff continued to refuse to perform the boiler cleaning despite safety concerns at the facility. After a meeting on November 7, 2005, and a private consultation the plaintiff had with his Union representative, the plaintiff agreed to clean the boiler "under protest." The Old Saybrook boiler cleaning took place on November 9, 2005. On November 26, 2005, the plaintiff failed to perform his preventative maintenance assignment on the Old Saybrook boiler but continued to log numerous hours responding to "no heat" calls at the facility. Eventually, the defendant called an outside contractor to service the Old Saybrook boiler and repair the leaks.

On November 7, 2005, Sammataro asked the plaintiff about two purchases the plaintiff had made without seeking or obtaining approval. The plaintiff did not provide a reason for failing to follow the required procedure; instead, he stated that he was never trained on the purchasing procedure. There was no need for training, as the only required action was to obtain authorization from the building mechanic's supervisor. Additionally, the plaintiff was present at various times when the purchasing procedure was discussed.

On August 11, 2005, Karen Rodgers ("Rodgers"), a client services employee of the defendant responsible for dispatching building mechanics, complained of the plaintiff's "VERY

---

[3] A respirator is worn to protect an individual from hazardous materials. The plaintiff wanted to wear a more intense respirator, with a full face piece and air filters. However, the defendant provided the plaintiff with an N-95 respirator for the job, which was rated for non-hazardous particulate matter. Tests on the air quality of the Old Saybrook boiler were performed by Bruce Austin, the Manager of Safety and Health Operations, who  concluded that the N-95 respirator was appropriate and safe for the job.

rude" behavior. (Doc. # 66-1, at 37). Rodgers reported that on August 9, 2005, she was unable to reach the plaintiff regarding a trouble ticket for which he was responsible. She later learned that the plaintiff had taken a day off but had failed to enter the information into the system as he was required to do to show that he was not working. When Rodgers eventually reached the plaintiff she asked him to enter this information into the system. The plaintiff told Rodgers that "it was not his problem" and "hung up on [her]" before she could finish speaking. (*Id.*)

On February 28, 2006, the plaintiff's employment was terminated. The Notice of Reportable Action pertaining to his termination contained the following remarks:

> Mr. Rebaudo is terminated for willful misconduct and continued violations of his Final Warning and the AT&T Code of Business Conduct including but not limited to:
> -  Making verbal threatening remarks to his coworkers
> -  Failing to follow management directives including but not limited to making unauthorized purchases of supplies and materials without getting management approval before the purchase and failing to complete his assigned PM work as directed by the supervisor
> -  Being subordinate to management including but not limited to telling his supervisor that he did not have to follow his supervisor's instructions
> -  Falsely reporting work as complete and signing off PM work that was not done jeopardizing the health and safety of others

(Doc. #66-3, at 13).

The plaintiff claims that in December 2005 the defendant investigated a concern that the plaintiff had falsified timesheets, but he acknowledges that the defendant concluded there was no falsification. The plaintiff was never docked pay, suspended or demoted as a result of this timesheet investigation. Approximately six months elapsed between the plaintiff's filing of a complaint of discrimination with the CHRO and the defendant's termination of his employment.

**PROCEDURAL HISTORY**

On August 15, 2005, after receiving his Final Warning, the plaintiff filed a complaint with the CHRO, alleging that the defendant's actions constituted unlawful discrimination.  After his termination on February 26, 2006, the plaintiff amended his CHRO complaint, alleging that the defendant had falsely accused him of altering his timesheets and wrongfully terminated his employment, both in retaliation for his having filed a complaint with the CHRO. On January 5, 2007, the CHRO released its jurisdiction over the plaintiff's complaint and authorized him to commence a civil action against the defendant in the Connecticut Superior Court. On February 20, 2007, the plaintiff filed his original complaint (the "2007 Complaint") against the defendant AT&T and Local 1298 of the Communication Workers of America ("the Union") in the Connecticut Superior Court raising various claims under state law.[4]

In March 2007 the defendant removed the case to this Court invoking federal question jurisdiction pursuant to 28 U.S.C. §1331. Although the plaintiff alleged violations of state law, the defendant argued that the 2007 Complaint actually raised questions governed exclusively by the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§141 *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001 *et seq.* On September 24, 2007, the defendant moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). On June 12, 2008, the Court ruled that the plaintiff's state law claims against AT&T were preempted by

---

[4] The 2007 Complaint alleged eight claims against the defendant: (1) wrongful discharge, (2) breach of implied contract, (3) breach of implied covenant of good faith and fair dealing, (4) retaliation pursuant to CFEPA, (5) negligent investigation, (6) negligent infliction of emotional distress, (7) defamation and (8) discrimination. (Doc. # 66, at 26-39).

federal law.[5] *Rebaudo v. AT&T*, 562 F. Supp. 2d 345, 351 (D. Conn. 2008). Rather than entering judgment in the defendant's favor, the Court allowed the plaintiff to file an amended complaint under ERISA.

On July 23, 2008, the plaintiff filed an amended complaint under ERISA. On August 6, 2008, the defendant filed a motion to dismiss, arguing that ERISA did not provide the relief that the plaintiff was seeking. The plaintiff was seeking legal relief, i.e. general money damages, but the portion of ERISA under which the plaintiff's complaint fell allowed for equitable relief only. Subsequently, on October 23, 2008, this Court ruled that ERISA did not authorize the relief the plaintiff sought and that the complaint should be dismissed, but allowed the plaintiff the opportunity to further amend his complaint "to plead in good faith a cause of action for equitable relief" under ERISA. *Rebaudo v. AT&T*, 582 F. Supp. 2d 250, 254 (D. Conn. 2008).  The Court noted that if the plaintiff did not file this amended complaint on or before November 24, 2008, the Court would close the case. *Id.*

The plaintiff did not file his amended complaint on or before November 24, 2008, resulting in the Court issuing an order directing that the dismissal remain in effect and the case be closed.  *Rebaudo v. AT&T*, No. 3:07CV00396 (DJS), 2009 WL 507042, at *1  (D. Conn. Nov. 25, 2008).  After the dismissal, in response to a request from the plaintiff that he and his attorney be provided with additional time to file an amended complaint, the plaintiff was granted

---

[5] Specifically, the Court ruled that six of the plaintiff's state law claims were preempted by the LMRA: (1) wrongful discharge; (2) breach of implied contract; (3) breach of the implied covenant of good faith and fair dealing; (4) negligent investigation, (5) negligent infliction of emotional distress; and (6) defamation. The Court also ruled that "[a]ll of the counts in the complaint . . . implicate[] ERISA." *Rebaudo v. AT&T*, 562 F. Supp. 2d 345, 350 (D. Conn. 2008).

additional time to file his amended complaint properly under ERISA. *Id.* On February 4, 2009, the plaintiff filed an amended complaint, but this complaint did not mention retirement benefits and was not brought under ERISA at all. Instead, the amended complaint alleged unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 200e *et seq*., and CFEPA. On February 10, 2009, the Court dismissed the plaintiff's amended complaint with prejudice. *Id.* at *3.  The Court had instructed the plaintiff to amend his complaint properly under ERISA; it did not grant him permission to change his complaint to allege Title VII and CFEPA violations. *Id*. at *2. The Court ruled that the plaintiff's Title VII retaliation claim was time-barred, as it had never been previously asserted and more than ninety days had passed since the relevant right-to-sue letter had been issued. *Id*. Additionally, the Court ruled that the plaintiff's CFEPA retaliation claim presumably was not time-barred, because CFEPA retaliation had been originally asserted in the 2007 Complaint. *Id*. at *3. However, the Court also dismissed the CFEPA claim, stating, "CFEPA is a Connecticut statute, not a federal law. The Court does not have original jurisdiction over CFEPA claims." *Id*.

On February 17, 2009, the plaintiff filed a new complaint with the Connecticut Superior Court (the "2009 Complaint"). (Doc. #1). The 2009 Complaint alleges a CFEPA retaliation claim against the defendant. In March 2009 the defendant removed the case to this Court, invoking diversity jurisdiction pursuant to 28 U.S.C. §1332. The defendant then moved to dismiss the complaint on the basis that the Connecticut accidental failure of suit statute did not apply to the plaintiff's complaint, and that the complaint was, for that reason, untimely. The Court denied the motion to dismiss, concluding that because the plaintiff had not received an adequate opportunity to litigate his CFEPA retaliation claim, he properly relied on the Connecticut accidental failure of

suit statute, Conn. Gen. Stat. §52-592,[6] to reassert his CFEPA retaliation claim in the 2009

Complaint. (Doc. # 49). The defendant subsequently filed its motion for summary judgment.

**DISCUSSION**

**I.      SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56. On a motion for summary judgment, the Court must "determine whether, as to any

material issue, a genuine factual dispute exists." *Kaytor v. Electric Boat Corp*., 609 F.3d 537,

545 (2d Cir. 2010). A fact is "material" if it "might affect the outcome of the suit under the

governing law," and a dispute as to a material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 248 (1986); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d

Cir. 2010).

In considering a motion for summary judgment, "the court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

---

[6] Conn. Gen. Stat. §52-592 states in relevant part:

(a) If any action, commenced within the time limited by law, has failed one or more times to be tried on its merits because . . .  the action has been dismissed for want of jurisdiction . . . the plaintiff . . .  may commence a new action… for the same cause at any time within one year after the determination of the original action . . . .

(d) The provisions of this section shall apply . . . to any action brought to the United States circuit or district court for the district of Connecticut which has been dismissed without trial upon its merits or because of lack of jurisdiction in such court.

Nonetheless, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Lunts v. Rochester City School District*, 515 F. App'x 11, 13 (2d Cir. 2013) (internal quotation marks omitted). "It is insufficient to rely on conclusory allegations or unsubstantiated speculation to defeat a motion for summary judgment." *Id.* (internal quotation marks omitted).

## II.    RES JUDICATA

Although the parties address res judicata as a secondary issue in their briefs, the Court finds it reasonable to address this issue first. If it is proper to dismiss the case on res judicata grounds, then the Court need not discuss the merits of the case.

The Court finds that the plaintiff's claim is not barred by the doctrine of res judicata because there was never a final judgment on the merits in the original action. "Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Greco v. Local.com Corp.*, 806 F. Supp. 2d 653, 657 (S.D.N.Y. 2011) (internal quotation marks omitted). Res judicata "prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided." *Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370, 377 (S.D.N.Y. 1999) (internal quotation marks omitted). "*Res judicata* does not require the precluded claim to actually have been litigated; its concern, rather, is that the party against whom the doctrine is asserted had a full and fair opportunity to litigate the claim." *EDP Medical Computer Systems, Inc., v. U.S.*, 480 F.3d 621, 626 (2d Cir. 2007).

The defendant argues that res judicata should bar this action because the plaintiff's 2007 Complaint was dismissed with prejudice by the Court. The defendant cites to a Second Circuit

case stating, "[a] dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action. A dismissal with prejudice is *res judicata* not only as to the matters actually litigated in the previous action, but as to all relevant issues which could have been but were not raised and litigated in the suit." *Samuels v. Northern Telecom, Inc*., 942 F.2d 834, 836 (2d Cir. 1991) (internal quotation marks and citations omitted).

While the Court dismissed the plaintiff's amended 2007 Complaint "with prejudice," *Rebaudo*, 2009 WL 507042, at *3, the Court clarified its position in the Memorandum of Decision and Order denying the defendant's Motion to Dismiss the 2009 Complaint. (Doc. #49). There was never a final judgment on the merits in the original action. "Rebaudo's CFEPA claim was not . . . decided on its merits. Rather, it was unambiguously dismissed for lack of jurisdiction. Specifically, the Court declined to continue to exercise supplemental jurisdiction solely over Rebaudo's CFEPA claim—a state-law claim—after having dismissed his Title VII claim—his only remaining federal-law claim." *(Id*. at 9-10). The Court clearly stated that the 2007 Complaint was dismissed for lack of jurisdiction. "[A] dismissal for lack of subject matter jurisdiction is not an adjudication on the merits, and hence has no res judicata effect." *St. Pierre v. Dyer*, 208 F.3d 394, 400 (2d Cir. 2000).

The defendant argues that the plaintiff had an adequate opportunity to raise this claim in the original action. The plaintiff did raise a CFEPA retaliation claim in the 2007 Complaint. However, the plaintiff did not have a full and fair opportunity to litigate the issue because the Court dismissed the case for lack of jurisdiction. Since the plaintiff did not receive an adequate opportunity to litigate his CFEPA claim on the merits in the original action, that claim is not

-16-

barred by res judicata.

III.     **PLAINTIFF'S CFEPA RETALIATION CLAIM**[7]

CFEPA provides that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82[8], 46a-83 or 46a-84[.]" Conn. Gen. Stat. §46a-60(a)(4). "The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA." *Williams v. Quebecor World Infiniti Graphics*, 456 F. Supp. 2d 372, 383 (D. Conn. 2006). *See also  Levy v. Commission on Human Rights and Opportunities*, 236 Conn. 96, 103, (1996) ("Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own antidiscrimination statutes.") Retaliation claims are reviewed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) ("The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII.").

"The court's first step is to determine whether the plaintiff established a *prima facie* case of retaliation." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997). "In order to

---

[7] The Court notes that timeliness is not an issue for the plaintiff because he filed the 2009 Complaint properly under Conn. Gen. Stat. §52-592, the accidental failure of suit statute.
[8] Conn. Gen. Stat. §46a-82 authorizes a person "claiming to be aggrieved by an alleged discriminatory practice" to file a complaint with the CHRO.

establish a prima facie case of retaliation, [a plaintiff] must show that: (1) []he engaged in a protected activity; (2) h[is] employer was aware of this activity; (3) the employer took adverse employment action against h[im]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Schiano v. Quality Payroll Systems, Inc.,* 445 F.3d 597, 608 (2d Cir. 2006). "The plaintiff's burden at this stage is slight - -  he may establish a *prima facie* case with *de minimis* evidence." *Wanamaker*, 108 F.3d at 465.

 If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to provide such a reason, the burden then shifts back to the plaintiff to show that the defendant's stated reason was not a true reason, but served as a pretext for discrimination. *Id*. at 804.

**A. Prima Facie Case**

 There is no dispute that the plaintiff has satisfied the first and second elements of his prima facie case. The plaintiff engaged in a protected activity when he filed his original complaint with the CHRO on August 15, 2005, alleging discrimination on the basis of his sex, and the defendant was aware of this protected activity.[9]

 Determining whether the defendant took adverse employment action against the plaintiff requires some discussion. The Supreme Court has stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a

_____

[9] The defendant does not make any attempt to deny that the plaintiff satisfied the first two elements of his prima facie case.

charge of discrimination." *Burlington Northern and Santa Fe Railway Co. v. White,* 548 U.S. 53, 68 (2006) (internal quotation marks omitted). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id*. "[A] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . ." *Kanhoye v. Altana, Inc*., 686 F. Supp. 2d 199, 208 (E.D.N.Y. 2009) (internal quotation marks omitted)."Reprimands, threats of reprimands, and excessive scrutiny of an employee, on the other hand, do not constitute materially adverse employment actions." *Oliphant v. Connecticut Department of Transportation*, Civil No. 3:02cv700 (PCD), 2006 U.S. Dist. LEXIS 77021, at *19 (D. Conn. Oct. 23, 2006).

In the present case, the plaintiff amended his CHRO complaint, on April 11, 2006, to allege retaliation when the defendant accused him of falsifying his timesheets in December of 2005 and terminated his employment in February of 2006. The defendant argues, correctly, that the plaintiff's allegation that the defendant falsely accused him of falsifying timesheets is not an adverse employment action. The plaintiff was never suspended, demoted or docked pay for the incident. The defendant conducted an investigation, concluded that the plaintiff had not falsified the timesheets and took no further action on the matter. "[A] criticism that carries with it no consequences is not materially adverse and therefore not actionable." *Bhatti v. Trustees of Boston University*, 659 F.3d 64, 73 (1ˢᵗ Cir. 2011). While this accusation and investigation may have been inconvenient to the plaintiff, he did not suffer any consequences as a result of it. Also, an accusation of falsifying timesheets would not rise to the level of dissuading another employee from engaging in a protected activity. The investigation of the falsification of timesheets is more

of a petty slight or minor annoyance; the plaintiff's job responsibilities were not diminished or altered by the incident. Therefore, the accusation that the plaintiff falsified timesheets is not a materially adverse employment action. *See Tepperwien v. Energy Nuclear Operations, Inc.*, 663 F.3d 556, 569 (2d Cir. 2011) (three fact-finding investigations of the plaintiff's activities in the workplace "were not disciplinary in nature" and " were not materially adverse as a matter of law").

While the Court has concluded that the actions of the defendant as they related to the plaintiff's time sheets were not materially adverse, there is no doubt that the termination of the plaintiff's employment was an adverse employment action. Thus, the plaintiff has satisfied the third element of his prima facie case on the basis of the termination of his employment.

Having satisfied the first three elements of his prima facie case, the plaintiff must now show that a causal connection exists between the adverse action and the protected activity. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Board of Education*, 232 F.3d 111, 117 (2d Cir. 2000). The plaintiff has not presented any evidence of direct causation. At his deposition the plaintiff acknowledged that his retaliation claim is based solely on timing. (Doc. #66-3, at 37). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark County School District v. Breeden*,

532 U.S. 268, 273 (2001) (internal quotation marks omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the . . . [protected activity] and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (collecting cases).

The plaintiff's termination occurred approximately six months after he filed the original complaint with the CHRO. "In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship." *Wilks v. Elizabeth Arden, Inc.*, 507 F. Supp. 2d 179, 196 (D. Conn. 2007). However, "[w]ithin the time period of one year, there is no firm rule. In some cases, time periods ranging from twelve days to eight months have been found to show the necessary temporal proximity. In other cases, time periods ranging from two-and-a-half months to eight months have been deemed insufficient to show the necessary temporal proximity." *Id.* (citation omitted).

The defendant relies on several cases to support its argument that temporal proximity is not enough to establish a causal connection when gradual adverse actions began well before the plaintiff engaged in a protected activity. *See Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Id.* The defendant argues that the plaintiff was given his Final Warning before he filed a complaint with the CHRO, which constitutes gradual adverse job actions, and does not create an inference of retaliation. The Court finds some merit in this argument, but does not find that this is enough to prevent the plaintiff from establishing his prima

face case. Keeping in mind that the Court is required to view the record in a light most favorable to the nonmoving party, and the standard for satisfying the prima facie case is minimal, the Court shall give the plaintiff the benefit of the doubt and conclude that he has satisfied his minimal burden in establishing a prima facie case of retaliation.

## B. Legitimate, Non-discriminatory Reason

The burden now shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action taken against the plaintiff. The defendant has done so here.

The defendant provides several legitimate, non-discriminatory reasons for its decision to terminate the plaintiff's employment. The plaintiff had a history of disciplinary action being taken against him, including a wage reduction and suspension. Sayre counseled the plaintiff regarding numerous performance issues, yet the plaintiff never showed any improvement. The other building mechanics regularly adhered to the required procedures, meeting the expectations of Sayre. The plaintiff did not respond to pages from dispatch, and often forgot to close out his tickets. For the year that Sammataro supervised the plaintiff, the plaintiff had the lowest preventative maintenance compliance numbers of the group. Additionally, another employee complained about the plaintiff's noncompliance with company procedures and rude behavior.

The plaintiff was given a Final Warning on August 11, 2005, a few days before he filed a complaint with the CHRO, as the result of an investigation and conclusion that the plaintiff had violated the sexual harassment policy and the Code of Business Conduct. Even after the Final Warning was given, the plaintiff's performance continued to fall below the defendant's standards. The plaintiff continued to have poor preventative maintenance completion rates despite several reminders from his supervisors of the importance of preventative maintenance.

The plaintiff continued his failure to follow the appropriate purchasing procedures. He also failed and, for a period of time, refused to perform his preventative maintenance assignment concerning the Old Saybrook boiler. Additionally, the defendant received a complaint from another employee regarding the plaintiff's behavior. For all of these reasons, the defendant terminated the plaintiff's employment for failure to comply with the conditions of his Final Warning and the AT&T Code of Business Conduct. Therefore, the defendant has met its burden of articulating a legitimate, non-discriminatory reason for the adverse employment action taken against the plaintiff.

**C. Pretext**

"Once a defendant articulates a legitimate, non-discriminatory reason for an adverse employment action, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext . . . ." *Zboray v. Wal-Mart Stores East, L.P.*, 650 F. Supp. 2d 174, 183 (D. Conn. 2009) (internal quotation marks omitted). The Court concludes that the plaintiff has not met his burden.

In the Court's view, there is a lack of evidence demonstrating that the plaintiff was terminated in retaliation for his complaint with the CHRO. The defendant argues that the plaintiff was terminated pursuant to violations of a Final Warning and the company Code of Business Conduct. The plaintiff argues that he was micromanaged by his supervisors, and that his supervisors were searching for problems with his work as an excuse for termination. However, the plaintiff has failed to produce sufficient evidence that would permit a reasonable jury to conclude that the adverse employment action he suffered was taken in retaliation for his complaint with the CHRO. "[A] party may not rely on mere speculation or conjecture as to the

true nature of the facts to overcome a motion for summary judgment." *Piela v. State of Connecticut Department of Correction,* No. 3:10cv749 (MRK), 2012 U.S. Dist. LEXIS 59148, at *14-15 (D. Conn. April 26, 2012) (internal quotation marks omitted).

The plaintiff has not demonstrated that the defendant's reasons for terminating him were untrue. The defendant has provided evidence of numerous performance issues that were present with the plaintiff and not the other building mechanics in the group. The plaintiff has not presented the Court with any evidence that these performance issues did not exist or were not the basis for his termination.

Further support of the plaintiff's failure to establish  pretext is the fact that he admitted in his deposition that timing was the only evidence he had connecting his termination to his filing of a CHRO complaint. "[W]hen asked whether []he had any information (other than the termination itself) showing that [the defendant] retaliated against h[im], the [p]laintiff testified that []he did not." *Weichman v. Chubb & Son,* 552 F. Supp. 2d 271, 288 (D. Conn. 2008). Similarly, the plaintiff in the instant case admits to the lack of evidence he has supporting a claim of retaliation. (Doc. #66-3, at 37). The Final Warning given to the plaintiff on August 11, 2005, before he filed a complaint with the CHRO, states that the plaintiff "will be assigned to report to work in a directly supervised environment." This statement is strong evidence against the plaintiff's argument that he was micromanaged by the defendant in retaliation for having filed a complaint with the CHRO. The plaintiff was informed in his Final Warning that he would be in a directly supervised environment, which he apparently perceives as micromanagement.  The Final Warning also cited one of the plaintiff's infractions as "failure to follow directives given by the management or to comply with Company policies." The plaintiff was given ample warning of the

-24-

defendant's concerns with his performance. He was also given several opportunities to improve his performance and comply with the various procedures at issue. The plaintiff did not improve his performance; instead, he offered excuses. The plaintiff has had an unfortunate experience with his employer. However, it is just that: an unfortunate experience. Not every termination is an unlawful retaliation.

As previously stated, for the purposes of summary judgment, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Lunts v. Rochester City School District*, 515 F. App'x 11, 13 (2d Cir. 2013) (internal quotation marks omitted). Here, the plaintiff has not come close to providing evidence sufficient to demonstrate pretext in connection with the termination of his employment. The plaintiff's evidence is not enough for a reasonable jury to return a verdict for him.

Therefore, the Court finds that the plaintiff has failed to demonstrate that the defendant's reasons for terminating his employment were pretext. Consequently, the defendant's motion for summary judgment as to the plaintiff's CFEPA retaliation claim is granted.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (doc. #65) is **GRANTED**. The Clerk is directed to close the case.


So ORDERED  this      30th      day of September,  2013.


_____/s/ DJS_____
                        Dominic J. Squatrito
                        United States District Judge